DEBORAH M. SMITH
Acting United States Attorney

JOSEPH W. BOTTINI
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: joe.bottini@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. 3:06-cr-010-JWS |
| | ) |
| Plaintiff, | ) **GOVERNMENT'S** |
| | ) **OPPOSITION TO** |
| vs. | ) **DEFENDANT** |
| | ) **PATTERSON'S MOTION TO** |
| JOSHUA MICHAEL PATTERSON, | ) **SUPPRESS EVIDENCE** |
| | ) |
| Defendant. | ) |
| | ) |

COMES NOW the United States of America, by and through counsel, and responds in opposition to defendant Patterson's motion to suppress evidence seized by law enforcement officers from the premises located at 727 O Street, Anchorage, Alaska.

I.  **INTRODUCTION** [1]

    A.  **The Robbery of the Credit Union 1 Branch**

On Wednesday, January 11, 2006, at approximately 3:20 p.m., the Credit Union 1 (CU1) branch located at 3500 Eide St., in Anchorage, was robbed by a man armed with a handgun. Witnesses said the robber brandished a large silver revolver with a long barrel and described him as a white male, approximately 6'0" to 6'2" tall, medium weight, clothed in a dark colored hooded sweatshirt, dark colored jeans, "winter" boots, and wearing a dark colored knit cap pulled down just above his eyes with a blue bandana around his face.

In response to the robber's demands for money, one of the victim tellers removed a stack of currency from her drawer which included an Electronic Transmitting Device (ETD). The teller placed the ETD in the middle of the stack of bills and placed the money on the counter in front of her. The robber walked down to the teller's station, took the money she had placed on the counter, and placed the stack in a plastic bag he was holding.

The robber forcibly took a total of $3,216.90 in U.S. currency from the victim tellers and yelled "have a nice day" as he fled the CU1branch.

---

[1] The facts set forth in this section are a proffer of the facts the government would expect to develop at an evidentiary hearing on this motion.

**B.     The Robber (Joshua Patterson) is Tracked to 727 O Street in Anchorage and is Apprehended**

Shortly after the robbery, Anchorage Police Department (APD) units began receiving a signal from the activated ETD in the Northwest Anchorage area. APD also confirmed that the CU1 branch on Eide St. had just been robbed.

An APD Officer tracked the signal to a residence located at 727 O Street in Anchorage. As the officer passed the residence, he observed two individuals walking into the house. The officer noted that the ETD signal was extremely strong as he pointed a receiver unit directly at the residence.

A number of other APD officers then arrived on the scene at 727 O Street to assist. From the outside of the residence, the officers were able to observe at least two people inside. One of these individuals (later identified as a juvenile accomplice of the defendant) was standing inside a window. The juvenile saw the officer and immediately put his hands up in the air. Another subject, later identified as defendant Joshua Patterson, then walked into the room behind the juvenile.

The officers told Patterson and the juvenile to come outside and they complied. The officers noted that Patterson was wearing a dark colored knit cap. As Patterson and the juvenile walked backwards towards the officers (in response

to the officers' demands) Patterson stated words to the effect of, "it's not like we're robbers". Patterson and the juvenile were then handcuffed and placed into separate patrol cars.

### C.  The Protective Sweep of the Residence

Officers then entered the residence to conduct a protective sweep. During the sweep, officers attempted to locate the live electronic tracking device (ETD) in order to turn the transmitter off.[2] As an officer removed the ETD (which was concealed within a pile of U.S. currency in a backpack found in the laundry room of the house), he also observed a loaded large caliber silver revolver and some clothing inside the backpack. The officer unloaded the firearm (removing four live rounds) for safety purposes.

### D.  The "Showup"

FBI Special Agents had initially responded to the robbery scene at the Credit Union 1 branch. They then proceeded to 727 O Street with a CU1 member (a customer) who had been present in the branch during the robbery. While Patterson was committing the robbery, the customer noted specific details about Patterson's

---

[2] The live transmitter needed to be deactivated due to public safety concerns. Had the tracking device been allowed to continue transmitting a signal, it would have interfered with law enforcement's ability to track another ETD signal should another bank robbery occur.

actions, together with his clothing and appearance. The customer observed the robber as a white male who was waiving a silver revolver around while he demanded "100's and 50's" from the tellers. The customer noted that the robber had what appeared to be a plastic bag in his other hand and had a blue bandana over the bottom half of his face. He also noted that the robber was wearing a dark colored knit cap. As the robber walked away from the second teller station, he walked right past the customer. The customer was close enough that he could see the man's eyebrows and thus distinguish the color of his hair.

The customer was brought to 727 O Street by the FBI agents approximately 45 minutes after the robbery. Patterson was removed from an APD patrol car and the witness confirmed that Patterson was the individual who had robbed the credit union.

    **E.**    **Consent to Search the House is Given by the Legal Tenant of 727 O Street**

At approximately 4:20 p.m., the FBI agents on scene at 727 O Street made contact with a Mr. John Mikel, who identified himself as the person then leasing and residing at the house. Mikel advised the agents that both he and a friend of his were the legal tenants of the residence and told them that Patterson and the juvenile had been staying with him at the house for the past few nights. Mikel further

explained that he (Mikel) controlled the residence and there were no areas of the house that he could not or would not go at any time he desired. Mikel advised that he had not given Patterson or the juvenile keys to the house because they were only staying there for a couple of days. Mikel again specifically told the agents that there were no rooms or other areas of the house that were locked or reserved exclusively for Patterson and/or the juvenile. Mikel then gave agents verbal consent (and ultimately written consent) to search the residence.[3]

A consent search was then conducted of the residence. The agents found a blue bandana lying on an upstairs floor of the house under a futon couch. In a downstairs laundry room, agents found a green backpack, a brown plastic shopping bag, a silver Smith and Wesson .44 magnum long barreled revolver, four loose .44 caliber rounds, a handful of U.S. currency, and the deactivated electronic tracking device. The backpack was found to contain two "hoodies" (hooded sweatshirts), a baseball cap, and a pair of gloves.

---

[3] When agents contacted Mikel the following day (January 12, 2006), Mikel advised the agents that Patterson and the juvenile had paid him (Mikel) $200 to rent a downstairs room in the house. Mikel specified that the agreement was that Patterson and the juvenile would pay him $65 per night to stay in the room. Mikel told the agent that he had not mentioned this to him the previous day because he did not think that it was important.

The following day (January 12), Mikel was again contacted by agents. Mikel advised the agents that after they had finished searching his residence and had departed the previous day, he had discovered a pair of green cargo style pants stuffed between the wall and a vanity cabinet in an upstairs bedroom. The agents made arrangements to meet Mikel to observe and possibly seize the pants and asked him not to disturb or move them until they arrived.

When the agents arrived, Mikel took them on a tour of the house and showed them how the doors to rooms on the downstairs level cannot be secured. While Mikel was showing this to the agents, the agents noticed additional articles of clothing (a green hooded "Carhart" jacket and a dark blue hooded sweatshirt) which might be associated with the robbery. Mikel consented to the agents seizing these additional items of clothing.

  **F.** **Patterson Executes a Written Waiver of his Miranda Rights and Talks to the Agents at the FBI Office**

After being taken into custody at 727 O Street on January 11, Patterson and the juvenile were transported to the FBI office in Anchorage for processing. Having ascertained the juvenile's status as a juvenile, the agents were required to obtain parental or legal guardian consent before asking him any questions. After some time, the agents were able to locate the juvenile's mother, who gave her

consent to the agents interviewing him. He was then advised of his Miranda Rights and agreed to waive them and answer questions without the presence of an attorney.

While the agents were questioning the juvenile, other agents were watching Patterson. They made sure that he had something to eat and drink. He was also given an opportunity to use a restroom. The agents repeatedly asked Patterson if he was okay as far as his physical comfort was concerned.

When the case agents finished questioning the juvenile, they turned to Patterson. At approximately 8:20 p.m., Patterson was advised of his Miranda Rights and provided a copy of the FBI Advice of Rights form to follow along. Patterson indicated that he understood his rights, and agreed to waive them and speak to the agents without the presence of an attorney. Patterson then executed a written waiver to that effect.

Patterson told the agents that he did not want to discuss the events that took place without a written deal stating that the juvenile would not be prosecuted. The agents told Patterson that they were not in a position to provide that to him and he refused to give any detailed information about the robbery.

    **G.**    **Patterson Makes a Spontaneous Admission to the Agents as they are Transporting him to Court for the Initial Appearance on January 12, 2006**

Patterson was charged on January 12, 2006, by criminal complaint with one count of bank robbery (in violation of 18 U.S.C. § 2113(a)and (d)) and one count of brandishing a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)(i) and (ii)). That afternoon, the agents went to the jail to pick Patterson up and transport him to court for his initial appearance. On the way to the courthouse, Patterson spontaneously asked the agents if he could plead guilty to the charges that day. An agent explained to Patterson what the purpose of the initial appearance was and told him that he would be given an opportunity to plead guilty if he wished at a later time.

**II.**    **ARGUMENT**

    **A.**    **The Protective Sweep of the O Street Dwelling was Supported by Reasonable Concerns Regarding the Safety of the Officers as well as Public Safety in General**

Patterson claims that his Fourth Amendment rights were violated as a result of the warrantless entry and subsequent consent search of the residence located at 727 O Street. As noted, APD officers initially made entry into the residence to conduct a protective sweep. During that sweep, they unloaded the firearm and turned off the electronic tracking device.

It is clear that the officer's had ample justification to make entry into the residence to do a security sweep for their own safety as well as the safety of others. The officers were responding to an armed bank robbery situation. They tracked the ETD signal to the house at 727 O Street and saw 2 individuals enter the residence. While two people ultimately came out of the house in response to the officers' demands, the officers had no idea whether someone else might be in there at the time or not. Also, they knew that the individuals who came out did not have a firearm with them, making it likely that a gun (as well as the ETD which was still transmitting a signal) might still be in the house.

To conduct a protective sweep, police need only have reasonable suspicion based on articulable facts that the area swept may harbor a person posing a danger to the officers or others. Maryland v. Buie, 494 U.S. 325, 337 (1990); United States v. Garcia, 992 F.2d 1273, 1282 (9th Cir. 1993); United States v. Flippin, 924 F.2d 163, 165-66 (9th Cir. 1991). Once a reasonable suspicion based on articulable facts exists, officers may conduct:

> a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.

Buie, 494 U.S. at 337.

Here, the nature of the call the officers were responding to - an armed bank robbery - together with their reasonable perception that there might be someone else in the house after Patterson and the juvenile had been removed, certainly supported their actions in entering the house to do a protective sweep. Indeed, it would have been a serious error for the officers not to conduct a protective determine whether anyone was inside the house who might pose a threat to the officers, and to check for weapons. See United States v. Hoyos, 892 F.2d 1387 (9th Cir. 1989) (overruled on other grounds). As the Ninth Circuit observed in Hoyos:

> We "'must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.'"

Id. at 1397 (citations omitted).[4]

---

[4] The fact that the officers detained Patterson and the juvenile outside the residence is of no constitutional consequence and in no way precludes a protective sweep of the residence. In Hoyos, a suspect was arrested outside a nearby residence without a warrant and a subsequent protective sweep of his residence was still deemed permissible:
> If the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another.

Id. at 1397.

The Ninth Circuit is not alone in adopting this reasoning. In fact, in <u>Hoyos</u> the Court specifically noted and adopted the reasoning of the Fifth Circuit's decision in <u>United States v. Jackson</u>, 700 F.2d 181, 189 (5th Cir. 1982), wherein the Fifth Circuit held that officers may permissibly search a premises if there is reason to believe the premises may harbor persons posing a danger to the officers. <u>See also</u> <u>United States v. Wiga</u>, 662 F.2d 1325, 1331 (9th Cir. 1982) (a protective sweep of a motor home is permissible when a reasonable suspicion based on articulable facts exists to believe others posing a danger may be in the motor home even though initial arrest made outside the motor home).

The officers actions during the protective sweep in rendering the firearm safe (unloading it) and turning off the ETD transmitter were also reasonable in light of the legitimate concerns regarding their safety as well as the safety of the public in general.

**B.    While a Search Warrant Could have been Obtained, Exigent Circumstances Justified Entry into the House**

At the time that the officers encountered Patterson at the O Street residence, they had ample probable cause to obtain a search warrant. It is well-settled that the determination of probable cause [to search] is based upon the totality of the circumstances known to the officers at the time of the search." <u>United States v. Soriano</u>, 361 F.3d 494, 505 (9th Cir.2004) (internal quotation marks omitted).

Clearly, based on the totality of the circumstances known to the officers at the time that Patterson and the juvenile exited the house, a search warrant could have been obtained for the premises at 727 O Street.  The officers knew that an armed robbery had occurred and that an electronic transmitting device had been activated during the robbery.  The ETD signal had been tracked right to 727 O Street - an officer received a very strong signal when he pointed it right at the house.  The officer also saw two men walk into the residence as he was tracking the signal to that location.  When two individuals exited the house in response to the officers' demands, the officers discovered that the individuals (Patterson and the juvenile) did not have a firearm with them or other evidence associated with the robbery.  The ETD continued to broadcast a strong signal from inside the house.

 Clearly, based on these facts alone a search warrant could have been obtained.  The officers had to make entry, however, to do the protective sweep as a result of the exigencies present.  The exceptions to the warrant requirement, sometimes described under the rubric of "exigent circumstances," include the need to protect an officer or the public from danger.  See, <u>United States v. McConney</u>, 728 F.2d 1195 (9th Cir.1984) (en banc).[5]

---

[5] As a general rule, the Ninth Circuit defines exigent circumstances as those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of

Again, the entry into the residence was justified by an objectively reasonable belief that someone else could be in the house who might pose a threat to the officers or to others, or who could remove or destroy evidence.[6]  See, Welsh v. Wisconsin, 466 U.S. 740, 753 (1984) (holding that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense").  Here, the underlying offense involved an armed robbery of a financial institution, and the police knew that the weapon had yet to be recovered, thus increasing the possibility that another person possibly inside the house could be armed.

Given that the officers had ample probable cause to obtain a search warrant, the items discovered when they made the "exigent circumstances" entry would have inevitably been discovered when a warrant was obtained.  As it turned out, however, a search warrant was not needed as the person who had actual and apparent authority to consent to a search of the residence in fact consented to it being searched.

---

relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc).   See also Ortiz-Sandoval, 323 F.3d at 1170; United States v. Richardson, 208 F.3d 626, 629 (7th Cir.2000).

[6] Even aside from the "officer safety" issue, entry was justified as "necessary to prevent physical harm" to another.  See, United States v. George, 883 F.2d 1407, 1412 (9th Cir.1989) (quoting United States v. McConney, infra.

### C. The Agents Obtained Consent to Search the Premises from the Person Who Had Both Actual and Apparent Authority to Give Such Consent

John Mikel was one of the legal tenants of the premises at 727 O Street. The agents and officers present at the scene contacted Mikel and asked him directed questions to ascertain his degree of control over the entire premises. Mikel explained that while Patterson and the juvenile had been staying at the house for the past few days, he (Mikel) controlled the residence and there were no areas of the house that he could not or would not go at any time he desired. Mikel specifically told the agents that there were no rooms or other areas of the house that were locked or reserved exclusively for Patterson and/or the juvenile. Mikel then gave agents verbal consent (and ultimately written consent) to search the residence.

#### 1. Mikel had Actual Authority to Consent

A consensual search is reasonable when the consent-giver has authority over the area searched. United States v. Matlock, 415 U.S. 164 (1974). A third party's consent to the search of another's belongings is valid if the consenting party has either actual or apparent authority to give consent. United States v. Davis, 332 F.3d 1163, 1169 (9th Cir.2003).

A third party has *actual authority* when he has "mutual use of the property [and also has] joint access or control for most purposes...." Davis, supra, at 171 n. 7. See also, United States v. Fultz, 146 F.3d 1102, 1105 (9th Cir.1998). Here, Mikel had actual authority to consent to a search of the entire premises. He was the legal tenant and certainly had mutual use of the property and joint access or control for most purposes. While Patterson and the juvenile were staying in a downstairs bedroom, Mikel had not given them keys to the house and explained to the agents that there were no rooms or other areas of the house that were locked or reserved exclusively for Patterson and/or the juvenile.

### 2. At a Minimum, Mikel had Apparent Authority to Consent

When the facts do not support a finding of actual authority, a search is reasonable if the consent-giver apparently has actual authority. Illinois v.Rodriguez, 497 U.S. 177, 188 (1990). The Ninth Circuit has established a three-part test to determine whether a third party has apparent authority to consent to a search:

First, did the searching officer believe some untrue fact that was then used to assess the extent of the consent-giver's use of and access to or control over the area searched?

Second, was it under the circumstances objectively reasonable to believe that the fact was true?

Finally, assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?

United States v. Dearing, 9 F.3d 1428, 1429-30 (9th Cir.1993) (citations omitted).

Apparent authority is measured by an objective standard of reasonableness, and requires an examination of the actual consent as well as the surrounding circumstances. See id. at 1430 ("Even when the invitation [to search] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.") (quoting Illinois v. Rodriguez, 497 U.S. 177, 188 (1990).[7]

Assuming that Mikel did not have actual authority to consent to a search of the entire premises, he clearly had apparent authority. In determining whether he in fact had apparent authority to consent, the court must apply the Dearing analysis to this situation as follows: First, did the agents believe, as an untrue fact, that Mikel had authority over the entire premises? Second, if so, was the agents' belief

---

[7] The apparent authority doctrine applies only to reasonable mistakes of fact, not to mistakes of law. United States v. Welch, 4 F.3d 761, 764-65 (9th Cir.1993).

that Mikel had access to or control over the entire premises objectively reasonable under the circumstances? Third, if it is assumed to be true that Mikel had access to or control over the entire premises, would that have given him actual authority to consent to its search?

The agents asked Mikel specific, directed questions to ascertain his dgree of control over the premises. He assured them that he did. There was nothing about the circumstances presented here which should have caused a reasonable person to question or doubt Mikel's assertions in that regard. Based on Mikel's answers to their specific questions, the agents reasonably concluded that Mikel had at least joint control over all areas of the house. Their belief that Mikel had control of, or authority over, all parts of the residence was objectively reasonable under the circumstances.[8]

Finally, if a reasonable person assumed that it was true that Mikel had access to or control over the entire premises, Mikel would have clearly had actual authority to consent to its search. See, United States v. Fultz, supra.

## III. CONCLUSION

---

[8] As explained in a leading treatise: "[I]f it is accepted that the making of searches by consent should not occupy second-class status in the hierarchy of law enforcement practices, then certainly the search should not be undone by reasonable good-faith mistakes of fact concerning the authority of the consenting party." Wayne R. LaFave, Search and Seizure § 8.3(g) at 173 (4th ed.2004) (emphasis in original).

For the reasons set forth above, Patterson's motion to suppress the evidence seized from the residence at 727 O Street must be denied.

RESPECTFULLY SUBMITTED this  13th  day of February, 2006, at Anchorage, Alaska.

             DEBORAH M. SMITH
             Acting United States Attorney

              s/ Joseph W. Bottini
             Assistant U.S. Attorney
             Federal Building & U.S. Courthouse
             222 West Seventh Avenue, Rm 253
             Anchorage, Alaska  99513-7567
             Phone: (907) 271-5071
             Fax: (907) 271-1500
             Email: joe.bottini@usdoj.gov

**CERTIFICATE OF SERVICE**

I declare under penalty of perjury that a true and correct copy of the foregoing was sent electronically to Sue Ellen Tatter on February 10, 2006.

 s/ Joseph W. Bottini