DEBORAH M. SMITH
Acting United States Attorney

JOSEPH W. BOTTINI
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: joe.bottini@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  vs.<br><br>JOSHUA MICHAEL PATTERSON,<br><br>  Defendant. | ) No. 3:06-cr-010-JWS<br>)<br>) **GOVERNMENT'S**<br>) **OPPOSITION TO**<br>) **DEFENDANT**<br>) **PATTERSON'S MOTION**<br>) **TO SUPPRESS**<br>) **STATEMENTS**<br>)<br>) |

COMES NOW the United States of America, by and through counsel, and responds in opposition to defendant Patterson's motion to suppress statements made by him to law enforcement officers on January 11-12, 2006.

I.   **INTRODUCTION** [1]

    A.   **The Robbery of the Credit Union 1 Branch**

On Wednesday, January 11, 2006, at approximately 3:20 p.m., the Credit Union 1 (CU1) branch located at 3500 Eide St., in Anchorage was robbed by a man armed with a handgun. Witnesses said the robber brandished a large silver revolver with a long barrel and described him as a white male, approximately 6'0" to 6'2" tall, medium weight, clothed in a dark colored hooded sweatshirt, dark colored jeans, "winter" boots, and wearing a dark colored knit cap pulled down just above his eyes with a blue bandana around his face.

In response to the robber's demands for money, one of the victim tellers removed a stack of currency from her drawer which included an Electronic Transmitting Device (ETD). The teller placed the ETD in the middle of the stack of bills and placed the money on the counter in front of her. The robber walked down to the teller's station, took the money she had placed on the counter, and placed the stack in a plastic bag he was holding.

The robber forcibly took a total of $3,216.90 in U.S. currency from the victim tellers and yelled "have a nice day" as he fled the CU1branch.

---

[1] The facts set forth in this section are a proffer of the facts the government would expect to develop at an evidentiary hearing on this motion.

> **B.    The Robber (Joshua Patterson) is Tracked to 727 O Street in Anchorage and is Apprehended**

Shortly after the robbery, Anchorage Police Department (APD) units began receiving a signal from the activated ETD in the Northwest Anchorage area. APD also confirmed that the CU1 branch on Eide St. had just been robbed.

An APD Officer tracked the signal to a residence located at 727 O Street in Anchorage. As the officer passed the residence, he observed two individuals walking into the house. The officer noted that the ETD signal was extremely strong as he pointed a receiver unit directly at the residence.

A number of other APD officers then arrived on the scene at 727 O Street to assist. From the outside of the residence, the officers were able to observe at least two people inside. One of these individuals (later identified as a juvenile accomplice of the defendant) was standing inside a window. The juvenile saw the officer and immediately put his hands up in the air. Another subject, later identified as defendant Joshua Patterson, then walked into the room behind the juvenile.

The officers told Patterson and the juvenile to come outside and they complied. The officers noted that Patterson was wearing a dark colored knit cap. As Patterson and the juvenile walked backwards towards the officers (in response

to the officers' demands) Patterson stated words to the effect of, "it's not like we're robbers". Patterson and the juvenile were then handcuffed and placed into separate patrol cars.

### C. The Protective Sweep of the Residence

Officers then entered the residence to conduct a protective sweep. During the sweep, officers attempted to locate the live electronic tracking device (ETD) in order to turn the transmitter off.[2] As an officer removed the ETD (which was concealed within a pile of U.S. currency in a backpack found in the laundry room of the house), he also observed a loaded large caliber silver revolver and some clothing inside the backpack. The officer unloaded the firearm (removing four live rounds) for safety purposes.

### D. The "Showup"

FBI Special Agents had initially responded to the robbery scene at the Credit Union 1 branch. They then proceeded to 727 O Street with a CU1 member (a customer) who had been present in the branch during the robbery. While Patterson was committing the robbery, the customer noted specific details about Patterson's

---

[2] The live transmitter needed to be deactivated due to public safety concerns. Had the tracking device been allowed to continue transmitting a signal, it would have interfered with law enforcement's ability to track another ETD signal should another bank robbery occur.

actions, together with his clothing and appearance. The customer observed the robber as a white male who was waiving a silver revolver around while he demanded "100's and 50's" from the tellers. The customer noted that the robber had what appeared to be a plastic bag in his other hand and had a blue bandana over the bottom half of his face. He also noted that the robber was wearing a dark colored knit cap. As the robber walked away from the second teller station, he walked right past the customer. The customer was close enough that he could see the man's eyebrows and thus distinguish the color of his hair.

The customer was brought to 727 O Street by the FBI agents approximately 45 minutes after the robbery. Patterson was removed from an APD patrol car and the witness confirmed that Patterson was the individual who had robbed the credit union.

    **E.**     **Consent to Search the House is Given by the Legal Tenant of 727 O Street**

At approximately 4:20 p.m., the FBI agents on scene at 727 O Street made contact with a Mr. John Mikel, who identified himself as the person then leasing and residing at the house. Mikel advised the agents that both he and a friend of his were the legal tenants of the residence and told them that Patterson and the juvenile had stayed with him at the house for the past few nights. Mikel further explained

that he (Mikel) controlled the residence and there were no areas of the house that he could not or would not go at any time he desired. Mikel advised that he had not given Patterson or the juvenile keys to the house because they were only staying there for a couple of days. Mikel again specifically told the agents that there were no rooms or other areas of the house that were locked or reserved exclusively for Patterson and/or the juvenile. Mikel then gave agents verbal consent (and ultimately written consent) to search the residence.[3]

A consent search was then conducted of the residence. The agents found a blue bandana lying on an upstairs floor of the house under a futon couch. In a downstairs laundry room, agents found a green backpack, a brown plastic shopping bag, a silver Smith and Wesson .44 magnum long barreled revolver, four loose .44 caliber rounds, a handful of U.S. currency, and the deactivated electronic tracking device. The backpack was found to contain two "hoodies" (hooded sweatshirts), a baseball cap, and a pair of gloves.

---

[3] When agents contacted Mikel the following day (January 12, 2006), Mikel advised the agents that Patterson and the juvenile had paid him (Mikel) $200 to rent a downstairs room in the house. Mikel specified that the agreement was that Patterson and the juvenile would pay him $65 per night to stay in the room. Mikel told the agent that he had not mentioned this to him the previous day because he did not think that it was important.

The following day (January 12), Mikel was contacted by agents. Mikel advised the agents that after they had finished searching his residence and had departed the previous day, he had discovered a pair of green cargo style pants stuffed between the wall and a vanity cabinet in an upstairs bedroom. The agents made arrangements to meet Mikel to observe and possibly seize the pants and asked him not to disturb or move them until they arrived.

When the agents arrived, Mikel took them on a tour of the house and showed them how the doors to rooms on the downstairs level cannot be secured. While Mikel was showing this to the agents, the agents noticed additional articles of clothing (a green hooded "Carhart" jacket and a dark blue hooded sweatshirt) which might be associated with the robbery. Mikel consented to the agents seizing these additional items of clothing.

### F. Patterson Executes a Written Waiver of his Miranda Rights and Talks to the Agents at the FBI Office

After being taken into custody at 727 O Street on January 11, Patterson and the juvenile were transported to the FBI office in Anchorage for processing. Having ascertained the juvenile's status as a juvenile, the agents were required to obtain parental or legal guardian consent before asking him any questions. After some time, the agents were able to locate the juvenile's mother, who gave her

consent to the agents interviewing him. He was then advised of his Miranda Rights and agreed to waive them and answer questions without the presence of an attorney.

While the agents were questioning the juvenile, other agents were watching Patterson. They made sure that he had something to eat and drink. He was also given an opportunity to use a restroom. The agents repeatedly asked Patterson if he was okay as far as his physical comfort was concerned.

When the case agents finished questioning the juvenile, they turned to Patterson. At approximately 8:20 p.m., Patterson was advised of his Miranda Rights and provided a copy of the FBI Advice of Rights form to follow along. Patterson indicated that he understood his rights, and agreed to waive them and speak to the agents without the presence of an attorney. Patterson then executed a written waiver to that effect.

Patterson told the agents that he did not want to discuss the events that took place without a written deal stating that the juvenile would not be prosecuted. The agents told Patterson that they were not in a position to provide that to him and he refused to give any detailed information about the robbery.

    **G.**    **Patterson Makes a Spontaneous Admission to the Agents as they are Transporting him to Court for the Initial Appearance on January 12, 2006**

Patterson was charged on January 12, 2006, by criminal complaint with one count of bank robbery (in violation of 18 U.S.C. § 2113(a)and (d)) and one count of brandishing a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)(i) and (ii)).  That afternoon, the agents went to the jail to pick Patterson up and transport him to court for his initial appearance.  On the way to the courthouse, Patterson spontaneously asked the agents if he could plead guilty to the charges that day.  An agent explained to Patterson what the purpose of the initial appearance was and told him that he would be given an opportunity to plead guilty if he wished at a later time.

**II.**    **ARGUMENT**

    **A.**    **Patterson was Advised of his Miranda Rights at the FBI Office and Voluntarily, Knowingly, and Intelligently Waived Those Rights before Speaking with the Agents**

After he was transported to the FBI office for processing, Patterson was advised of his Miranda Rights by the FBI agents and was provided a copy of the FBI Advice of Rights form to follow along prior to any questioning.[4]  Patterson

---

[4] While there was some delay before the agents questioned Patterson, it was occasioned by the agents efforts to locate a parent or guardian of the juvenile in order to obtain consent to question him.  They then interviewed the juvenile.  While the

indicated that he understood his rights, and agreed to waive them and speak to the agents without the presence of an attorney. Patterson then executed a written waiver to that effect.

Patterson told the agents that he did not want to discuss the events that took place without a written deal stating that the juvenile would not be prosecuted. The agents told Patterson that they were not in a position to provide that to him and he refused to give any detailed information about the robbery.

"For a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given. Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." United States v. Doe, 155 F.3d 1070, 1074 (9th Cir.1998) (en banc) (internal quotation marks and citations omitted).

"A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " Doe, 155 F.3d at 1074, quoting Moran v. Burbine, 475 U.S. 412, 421(1986). Here, Patterson

---

agents were questioning the juvenile, other agents made sure that Patterson had something to eat and drink and that he was given an opportunity to use a restroom. The agents repeatedly asked Patterson if he was okay as far as his physical comfort was concerned and he assured them that he was.

clearly "indicated that he understood his rights after they were explained to him," United States v. Bautista-Avila, 6 F.3d 1360, 1366 (9th Cir.1993). Understanding his rights, he chose to waive them and briefly speak to the agents.

"A waiver is voluntary if, under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement." Doe, 155 F.3d at 1074.

Here, there is no question that Patterson voluntarily agreed to briefly speak to the agents. His consent was not coerced in any manner whatsoever. He wasn't threatened. The agents took care to make sure that he was given something to eat and drink as well as making sure that he was able to use a restroom when needed before he was questioned. They repeatedly asked if he was comfortable. His voluntary statements were just that - voluntary.

### B. Patterson's Spontaneous Statements were not the Product of Express Questioning or it's Functional Equivalent and are Therefore not Subject to Suppression

The government does not dispute that Patterson was in custody (for purposes of whether Miranda warnings may have been required) when the officers ordered him to come out of the house on January 11, and when the agents were transporting him to court on January 12.

However, *he was not subjected to any custodial interrogation at these times*.  Patterson made the following completely unsolicited statements to officers and agents:

<u>January 11, 2006, as he was exiting the house</u>:

"It's not like we're robbers"

<u>January 12, 2006, as he was being transported to court</u>:

"Can I plead guilty today?"

*Miranda* protection only extends to those persons who, while in police custody, **are interrogated** by persons the suspect knows are acting on behalf of the government.  In <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." The standard for determining whether an officer's comments or actions constitute the "functional equivalent" of interrogation is quite high.  *See*, <u>United States v. Moreno-Flores,</u> 33 F.3d 1164, 1169-70 (9th Cir. 1994) (fact that statements made by an officer may have struck a responsive cord, or even that they may have constituted "subtle compulsion" is insufficient to find that they were the functional equivalent of an interrogation).[5]

---

[5] Because the police cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably

Here, the officers were not asking Patterson questions when he made his unsolicited comments after they instructed him to come out of the house. Likewise, the agents did not ask him any questions while he was being transported to court. Nor did they make any statements or comments that would constitute the functional equivalent of interrogation. Patterson's spontaneous, unsolicited statements were therefore not the product of any express questioning or it's functional equivalent and are not subject to suppression.

### III.  CONCLUSION

For the reasons set forth above, Patterson's motion to suppress statements must be denied.

RESPECTFULLY SUBMITTED this  13th  day of February, 2006, at Anchorage, Alaska.

>                    DEBORAH M. SMITH
>                    Acting United States Attorney
>
>                     s/ Joseph W. Bottini
>                    Assistant U.S. Attorney

---

likely to illicit an incriminating response. Rhode Island v. Innis, 446 U.S. at 301-02, 100 Sup. Ct. 1682); United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981). "Relatively innocuous questions may, in light of the unusual susceptibility of a particular suspect, be reasonably likely to illicit an incriminating response." Booth, supra, at 1238. "On the other hand it is relevant, but not determinative, that a question posed was not related to the crime or the suspects participation in it." Id.

Federal Building & U.S. Courthouse
222 West Seventh Avenue, Rm 253
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: joe.bottini@usdoj.gov

**CERTIFICATE OF SERVICE**

I declare under penalty of perjury that a true and correct copy of the foregoing was sent electronically to Sue Ellen Tatter on

February 10, 2006.

  s/ Joseph W. Bottini