# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA )
                       )
        Plaintiff, )
                       )   Case No. 3:06-CR-00010-JWS
v. )
                       )   **RECOMMENDATION**
JOSHUA MICHAEL PATTERSON, )   **REGARDING MOTIONS**
                       )   **TO SUPPRESS and EXCLUDE**
        Defendant. )
_____ )   (Document Nos. 14, 16 & 18)

Defendant Joshua Patterson has filed three motions for relief which are now before the court. The motion to exclude in-court identification, docket entry 14, opposed by the government at docket entry 21; motion to suppress statements, docket entry 16, opposition at docket entry 22; and motion to suppress items from residence, docket entry 18, opposition at docket entry 20. A single evidentiary hearing was conducted on these motions before the magistrate judge on March 6, 2006. Upon due consideration of the evidence adduced and arguments of counsel, the magistrate judge recommends that the court adopt findings of fact and conclusions of law and that the pending motions be DENIED.

**Findings of Fact**

On January 11, 2006, about 3:20 p.m. the Credit Union 1 located at 3500 Eide Street in Anchorage, Alaska, was robbed by a man armed with a handgun. Witnesses provided a general description of the robber as a white male, 6 feet tall, wearing a dark-colored hooded sweatshirt, dark-colored jeans and "winter" boots, and brandishing a large silver revolver with a long barrel. Bank surveillance cameras recorded the robber wearing a dark-colored knit cap pulled down above his eyes with a blue bandana around his face. *See*, photo, government's exhibit 4. The robber was given currency in the amount of $3,216.90. The stack of currency contained an electronic transmitting device (ETD).

Shortly after the robbery Anchorage Police Department (APD) units began receiving a signal from the activated ETD in the northwest area of Anchorage. APD officers responded to the credit union and notified the FBI. Officer Kevin Ehm, APD, a trained operator for Pro Net Tracking (the electronic tracking device used by the police and financial institutions) was participating in the investigation of a traffic accident in the vicinity of 36th and Denali when his patrol unit was activated.

When the ETD goes off, a signal is transmitted by various towers in town allowing the police to track the source of the ETD by triangulating the response to various receivers. Officer Ehm was advised by dispatch that the towers were hot and he was advised by an officer that the credit union had been robbed. Officer Ehm immediately drove west on 36th toward the credit union. In the vicinity of 36th Avenue between C Street and A Street he temporarily lost direction because the signal was bouncing off large buildings nearby. He

continued to the credit union and stopped east of the credit union to get a fix. He receives both a visual and audible tone to guide him in the direction of the ETD.

Coordinating with two other officers who had similar receivers, Officer Ehm began driving on A Street going north toward Ninth Avenue. His receiver led him to O Street and 8th when he observed a younger native male and an older white male with facial hair carrying a green backpack. He observed the two men enter a white house with red trim at 727 O Street. Officer Ehm identified the two individuals as suspects and reasoned that they would have had to travel to that location in a vehicle which was consistent with the change in signal locations that he had received while tracking. He requested another officer to check the alleyway to see if there was a vehicle with a warm engine.

The officer located such a vehicle, a U-Haul van, in the alleyway. Meanwhile Officer Ehm approached the southwest corner of the building and Officer Bloodgood observed movement inside the residence. Officer Bloodgood hollered for the two individuals to come out and an individual later identified as Joshua Patterson (the defendant) and a male juvenile came out of the building.

An officer directed the two suspects to put their hands up, turn around, and slowly walk backward toward the officer. They complied. Officer Ehm approached the large male to take him into custody and Patterson stated without being questioned, "I don't know anything about a robbery." Officer Ehm asked if he had any weapons on him.

In performing his pat-down search officer Ehm noticed a large unidentified object in Patterson's right front pocket. Officer Ehm had seen credit card knives in the past and retrieved the item for officer safety. It turned out to be a U-Haul key chain.

The crime being investigated was an armed robbery at the credit union. The officers did not know if there were still people inside the residence and they had yet to observe a firearm on either Patterson or juvenile who exited the residence. Officer Ehm used his hand-held tracking device, and it continued to show the signal coming from inside the residence. Officers then made an announcement at the front door and entered the residence to perform a protective sweep of the upstairs and downstairs. No additional occupants of the residence were found.

Officers Evans and Ehm entered the residence with the officers performing the protective sweep in order to retrieve the active battery-operated ETD device which was considered evidence. As long as the device continued to send out a signal it would potentially interfere with another robbery since the same towers were used in town for tracking and it would be difficult if not impossible to triangulate with two separate ETDs sending signals. Officer Ehm wanted to deactivate the unit as soon as possible.

During the protective sweep an officer noticed a backpack in the laundry room. Officer Ehm used his hand-held device on the downstairs of the residence while officer Evans used a similar device to see if the signal was coming from upstairs. Officer Ehm tracked the signal to a backpack wedged between the washer-dryer in the laundry room. He located the backpack, opened the main compartment which disclosed a bundle of bills (and

the ETD), a revolver and some clothing.  The officer unloaded the revolver and left it in place and deactivated the money pack.  Officer Ehm estimated that he entered 727 O Street about 15 minutes after the signal initially had gone off.  It is undisputed that the officers had no search warrant or consent to enter the premises when they conducted the protective sweep or entered to retrieve the signaling device.  The officers did not remove any evidence from the residence at that time.

Agent Payne ascertained the owner of the premises to be a John Wirum who advised that the premises were leased to John Mikel.  About 4:20 p.m. Special Agent Steven Payne, FBI, contacted Mr. Mikel who identified himself as the person then leasing and residing at the house.  Mikel told the officer that Patterson and the juvenile had been staying with him at the house for the past few nights.  He advised that he had not given Patterson or the juvenile keys to the house because they were only staying there for a few days.  He also told the agent that there were no rooms or areas of the house that were reserved exclusively for Patterson and/or the juvenile.  Mikel gave the agents verbal consent to search the residence.

A consent search was then conducted of the residence.  The agents found a blue bandana upstairs in the residence; downstairs in the laundry room the agents found a green backpack, a silver Smith & Wesson .44 magnum long-barreled revolver, four loose .44 caliber rounds, a handful of U.S. currency, and the deactivated electronic tracking device. Inside the backpack the agents found two hooded sweatshirts and other clothing.

On January 12, 2006, FBI agents again contacted Mikel. Mikel told the agents that after they had left the previous day he had discovered a pair of green cargo pants stuffed between the wall and the vanity cabinet in an upstairs bedroom. Agents again met with Mikel in the residence. While inside the agents observed a green hooded Carhartt jacket and a dark blue hooded sweatshirt which they considered as possibly being associated with the robbery. Mikel consented to the agents seizing these additional items of clothing.

### Show Up

Special Agents Christopher Jones, Steve Payne, and John Eckstein went to Credit Union 1 on January 11, 2006. Shortly after 4:00 p.m. Agents Jones and Payne were asked to go to 727 O Street where the Anchorage police officers were holding suspects in custody. The agents met Eric Gurley, a private citizen, who had been standing in line waiting for an open teller at the credit union when the bank robbery occurred. Mr. Gurley is depicted in government's exhibit 4 with his hands up in the air as the bank robber is approaching his direction from a teller's window while holding a bag of cash.

Gurley had explained to the agents that the robber had walked past him and that he (Gurley) had seen the robber wearing dark-colored pants. The agents decided to take Gurley to the residence for a show-up because Gurley had said he had gotten a good look at the robber and could possibly identify him. Agent Payne drove the agents and Gurley to the vicinity of 727 O Street and parked about 20 feet away. Agent Jones told Gurley that they were going to show him a person in custody to see if he could identify him as the bank robber.

There were about four police cars in the vicinity and Patterson was in the back seat of one of those vehicles. Upon their arrival SA Payne spoke to APD officers about a show-up. The agents advised Gurley to base his decision on observations that could not readily change such as height, weight, and facial hair. Patterson was told to step out of the police car, and officers helped him since he was still handcuffed behind his back. Patterson was not asked to speak but he was told to face different directions from a stand-still position.

Gurley remarked that Patterson was not wearing the same clothes, but it was the same person he saw rob the bank. He based his opinion on the subject's size, height, and shape. The officers did not ask Gurley to express the certainty with which he was able to identify the suspect as the robber. Patterson was then placed back into the patrol vehicle, and Gurley was subsequently returned to the credit union by one of the police officers. The show-up lasted about thirty seconds.

After the show-up the agents drove Gurley back to the credit union and Patterson was transported by the police to the FBI office. There, Patterson was taken to the second floor interview room for questioning. Sometime after 5:00 p.m. an FBI Agent advised Officer Jones that Patterson wanted to talk. Agents Jones and Payne decided to delay talking with Patterson until after they had talked to the juvenile. There was a slight delay in locating the juvenile's mother, but she did consent to the officer's interview with her son. After the juvenile was debriefed the agents turned their attention to Patterson. They spoke with him inside a room that was approximately 10' X 15'. Agent Payne read Patterson the Miranda rights and provided a copy of the FBI Advisement of Rights form FD-395 for

him to follow.  The agent asked if Patterson understood his rights and he said he did.  After hearing his rights read to him, Patterson was told the purpose of the interview.  Patterson was advised that he was under arrest for robbing Credit Union 1.

Patterson initially advised the government that he had nothing to do with the robbery.  He seemed agitated and nervous.  The interview with the juvenile took about an hour (between 6:00 and 7:00 p.m.).  Patterson was interviewed about 8:05 p.m.  Patterson was given fig newtons and water.  Patterson agreed to waive his <u>Miranda</u> rights but wanted written assurance that the juvenile would not be prosecuted.  The FBI agents told Patterson that this decision was not up to them.  Patterson was told that it would be to his benefit to cooperate.  About 8:10 p.m. Patterson signed a form waiving his rights.  He initialed each sentence on the advice of rights form.  He appeared oriented and cognizant of what was going on; he did not appear to be intoxicated.  Patterson advised that he knew the juvenile through his brother Jake.

Patterson told the agents that he did not want to discuss the events without a written agreement stating that the juvenile would not be prosecuted.  The agents told Patterson that they could not make that assurance and Patterson refused to provide details about the robbery.  The total time Patterson remained in custody before being taken to the jail facility was five to six hours.

On January 12, 2006, Patterson was formally charged in a criminal complaint with one count bank robbery in violation of 18 U.S.C. §2113(a) and (d), and one count of brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C.

§§924(c)(1)(A)(i) and (ii).  While the agents were transporting Patterson to court for his initial appearance Patterson spontaneously asked the agents if he could plead guilty to the charges that day.  The agents explained to Patterson the purpose of the initial appearance and told him that he would be given an opportunity to plead guilty at a later time if that was his decision.

### Conclusions of Law

#### A.  In-Court Identification

Patterson requests the court to exclude any in-court identification by a Credit Union 1 customer (identified at the evidentiary hearing as Mr. Eric Gurley) arguing that such identification would be tainted by the impermissibly suggestive out-of-court identification procedure used by the police to conduct a show-up.  Patterson cites Stovall v. Denno, 388 U.S. 293 (1967); Neil v. Biggers, 409 U.S. 188 (1972); and Manson v. Brathwaite, 432 U.S. 98 (1977).

In Stovall the Supreme Court held that the defendant could claim that "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law."  Id. at 301-302.  The Court held that whether due process would be violated depended upon a determination of the totality of the circumstances.  In Stovall the Court found that on the facts of the case before it, due process was *not* violated.  There, injuries to a witness justified a show-up in her hospital room.

Identification testimony is admissible at trial provided that any pretrial identification procedure was not impermissibly suggestive or, if impermissibly suggestive, did not create a substantial risk of mis-identification. Determining the admissibility of identification testimony involves a two-step process. First, the court must decide whether the out-of-court identification procedure *was* impermissibly suggestive. Then, if the procedure is found to have been impermissibly suggestive, the court must determine whether, under the totality of the circumstances, the suggestive procedure created a substantial risk of misidentification. If the answer to either of these inquiries is negative, testimony as to identification is admissible. Neil v. Biggers, *supra*; Manson v. Brathwaite, *supra*. *See also*, United States v. Freie, 545 F.2d 1217 (9th Cir. 1976).

Under Manson reliability is the lynchpin in determining the admissibility of identification testimony. In assessing the reliability of the identification testimony in light of the suggestive identification procedure used with Mr. Gurley, I have considered the following factors: (1) the opportunity of the customer to observe the suspect at the time of the bank robbery; (2) the degree of attention paid by the customer at the time of the credit union robbery; (3) the accuracy of the customer's prior description of the perpetrator; (4) the level of certainty demonstrated by the customer at the pretrial confrontation; and (5) the length of time between the robbery and the pretrial confrontation.

Displaying Patterson in a single person show-up was suggestive that he was the robber. Testimony relating to a single person show-up immediately after a crime occurs, however, may be admissible at trial. *See*, United States v. Williams, 626 F.2d 697 (9th Cir.

1980); <u>United States v. Rice</u>, 652 F.2d 521 (5th Cir. 1981); <u>United States v. Bagley</u>, 772 F.2d

482 (9th Cir. 1985).  The evidence at the suppression hearing reveals that Mr. Gurley had an

opportunity to visibly observe the robber close-up at the time of the crime.  *See*,

government's exhibit 4.  He provided the FBI agents with a description of the robber and the

show-up took place soon after the robbery had occurred.  Mr. Gurley identified Patterson at

the show-up but commented on the difference in apparel that he appeared to be wearing at

the time of the show-up.

      In the instant case, the police did not verbally suggest that the person in

custody was the bank robber nor is there any evidence that the police told Mr. Gurley that

the person he was viewing was "probably" the bank robber.  Although the show-up was

suggestive, I find that it was not impermissibly suggestive.  Mr. Gurley already had a fixed

opinion of what the robber looked like.  Even if it were, automatic exclusion of identification

testimony is not required.  <u>Bagley</u>, 772 F.2d at 492.  *See also*, <u>Manson v. Brathwaite</u>, 432

U.S. at 113-14; <u>Neil v. Biggers</u>, 409 U.S. at 198-99.

      If under the totality of the circumstances the identification is sufficiently

reliable, identification testimony may properly be allowed into evidence even if the

identification was made pursuant to an unnecessarily suggestive procedure. 772 F.2d at 492.

As in <u>Bagley</u>, Mr. Gurley saw the suspect seated in the police car, handcuffed and

surrounded by law enforcement officials.  After Patterson was asked to get out of the vehicle,

the customer stated that he believed that Patterson was the robber.  There is nothing in the

record that hints of any verbal encouragement by the police to identify Patterson as the

robber.  *See*, United States v. Kessler, 692 F.2d at 584, wherein the Ninth Circuit held that a show-up at the bank shortly after the commission of a robbery, although suggestive, was a legitimate procedure.  While the robbery was occurring, Mr. Gurley observed that the robber was a white male wearing a blue bandana over the bottom half of his face.  He noted that the robber was wearing a dark colored knit cap.  As the robber walked from the second teller's station he walked right past Mr. Gurley.  Mr. Gurley was close enough to see the man's eyebrows and distinguish his hair color.

Under Bagley a one-on-one show-up is a legitimate identification procedure. The question is not whether there was a better procedure, less suggestive, available to the law enforcement officers.  Under the totality of the circumstances concerning the show-up procedures utilized by the police in the instant case, I conclude that Patterson's motion to exclude in-court identification at trial based upon impermissibly suggestive pretrial procedures should be denied.

### B.  Defendant's Statements

Patterson stated to the police when he was asked to come out of the residence on January 11, 2006, "It's not like we're robbers."  That statement was not made in response to interrogation nor was it responsive to the demand that the occupants come out of the residence.  Interrogation is defined as "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  The command to exit the building does not constitute words or actions on the part of the police that they should have known would reasonably elicit an incriminating response.

Patterson executed a written waiver of his Miranda rights on January 11, 2006, at the FBI office in Anchorage. Prior to this waiver Patterson had been advised of his Miranda rights and provided a copy of the FBI advice of rights form. The preponderance of the evidence supports the conclusion that Patterson indicated that he understood those rights and agreed to waive his rights and to talk with the agents without an attorney.

The evidence indicates that the agents did not ask Patterson any questions while he was being transported to court. Patterson invoked his right to decline to talk about the details of the robbery. From the evidence I conclude that Patterson's inquiry of the agents who were transporting him to the court about whether he could plead guilty to the charges that day was made spontaneously. There is no evidence of any statements or conduct by the officers who were transporting him to elicit such a question. Patterson was not being interrogated or questioned at the time the statement was made. Thus, Patterson's statements were not the product of express questioning or it functional equivalent and need not have been preceded by Miranda warnings. I conclude that Patterson's spontaneous, unsolicited statements were not the product of any express questioning or its functional equivalent and are not subject to suppression.

C. Items Seized from Residence

Patterson had been an overnight guest at 727 O Street and therefore had an expectation of privacy and standing to bring his motion to suppress. The government does not contest standing. The government justifies the initial entry into the residence in order to conduct a protective sweep. The APD officers had tracked the electronic tracking device to

that location and had observed two suspects (Patterson and the juvenile), one of whom met the general description of the robber.  An officer saw the two individuals enter the residence and asked them to come out of the house.  Neither individual who came out possessed a firearm making it likely that there could be a firearm still in the house.

The entry for a protective sweep was reasonable based upon the articulable facts that a person posing a danger to the officers could be inside.  *See*, <u>Maryland v. Buie</u>, 494 U.S.  325, 337 (1990); <u>United States v. Garcia</u>, 992 F.2d 1273, 1282 (9th Cir. 1993); <u>United States v. Flippin</u>, 924 F.2d 163, 165-66 (9th Cir. 1991).  Thus, the officer could conduct a quick and limited search of the premises to protect the safety of the officers or others.  Such a search is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.  <u>Buie</u>, 494 U.S. at 337.

The fact that Patterson and the juvenile were detained outside the residence did not nullify the existence of the exigencies relied upon to support a protective sweep.  *See*, <u>United States v. Hoyos</u>, 892 F.2d 1387, 1397 (9th Cir. 1989) *overruled on other grounds*; <u>United States v. Wiga</u>, 662 F.2d 1325, 1331 (9th Cir. 1982).  During the protective sweep an officer turned off the ETD transmitter as a matter of public safety.  The transmitter was not seized at that time although it constituted evidence.  An officer observed a firearm and unloaded it to render it safe.  Based on the totality of the circumstances known to the officers at the time, I conclude that these actions did not violate the defendant's Fourth Amendment rights.  The officers clearly had probable cause to enter the residence even though they had

not sought a search warrant.  The need to protect officers and the public from danger constituted exigent circumstances for this limited entry.

The officers at the scene contacted John Mikel, a legal tenant of the premises at 727 O Street, and asked him for consent to search the residence.  Mikel gave verbal consent followed by written consent for the residence to be searched.  Patterson does not contest the authority of Mikel to grant a consensual search.  I conclude that Mikel had actual and legal authority to consent to the search of the entire premises.  Mikel had not given keys to the house to Patterson.  He explained to the agents that there were no rooms or areas of the house that were reserved exclusively for Patterson and/or the juvenile.  Seizure of items from the residence based upon the consent search did not violate the Fourth Amendment.

For the foregoing reasons Patterson's motion to suppress evidence seized from the residence should be denied.  For the same reasons Patterson's motion to suppress his statements as fruit of an unlawful search under <u>Wong Sun v. United States</u>, 371 U.S. 471, 487 (1963) should likewise be denied.  Patterson's motion to exclude in-court identification, docket entry 14; the motion to suppress statements at docket entry 16; and the motion to suppress items from the residence at docket entry 18 lack merit and should be denied.  IT IS SO RECOMMENDED.

DATED this  30th    day of March, 2006,  at Anchorage, Alaska.


 /s/ John D. Roberts                           
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON April 12, 2006**, to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before **NOON *April 18, 2006**.   The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).